UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **INDICTMENT NO. 409-142** |
| | ) | |
| v. | ) | **18 U.S.C. 371 (Conspiracy)** |
| | ) | **18 U.S.C. 1343 (Wire Fraud)** |
| **HANNES S. ROBINSON, and** | ) | **18 U.S.C. 1956(h) (Money Laundering** |
| **CYNTHIA FLANDERS BAER,** | ) | **Conspiracy)** |
| | ) | |
| **Defendants.** | ) | |

**MOTION FOR RULE 17(C) SUPBEONA TO ISSUE TO BAYER
PHARMACEUTICAL/TALECRIS TO DISCLOSE REDACTED MATERIAL
CONCERNING KNOWLEDGE OF DOMESTIC SALES**

Now Comes HANNES S. ROBINSON, through undersigned counsel, and files this Motion for Rule 17(c) Subpoena to Issue to Bayer Pharamceutical/Talecris[1] to Disclose Redacted Material Concerning Knowledge of Domestic Sales.

**INTRODUCTION**

In June 2009, Mr. Robinson was charged in a multi-count indictment with, among other charges, a section 371 conspiracy to defraud Bayer Healthcare ("Bayer") to obtain money and property and the intangible right to honest services by wire fraud and mail fraud and by causing the interstate transportation of pharmaceuticals obtained by fraud. *See* Indictment, Dkt. 3. The essence of the alleged conspiracy is that Mr. Robinson and the co-conspirators/defendants[2]

---

[1] Bayer sold its biologics division to Talecris in 2005. Indictment, Dkt 4, at § 2. Throughout this motion, any reference and request for production that refers to Bayer shall also be intended to refer to Talecris. Undersigned counsel has learned that Bayer and Talecris are represented by the same counsel for this matter.

[2] Co-defendant Cindy Flanders Baer entered a guilty plea in this case. (Dkt. 52) Four other co-conspirators entered guilty pleas in this Court, pursuant to Informations, and are awaiting sentencing. See, *U.S. v. John Cutter*, CR 409-157; *U.S. v. Masoud Tehami*, CR 409-158; *U.S. v. John Perez*, CR 409-159; *U.S. v. Nisar Khokhar*, CR 409-160.

1

represented to Bayer that he was a domestic exporter – a United States company purchasing product for export – when in fact he was selling it domestically, a practice referred to as "diversion". See *Id.* at §§ 12-20. Mr. Robinson entered a plea of guilty to Count One, a violation of 18 U.S.C. 371. (Dkt. 51)  Mr. Robinson has admitted his guilt and now faces sentencing by this Court.

The U.S. Probation Office has prepared a Presentence Investigation Report ("PSI"), and Mr. Robinson timely filed his objections.  The Revised PSI has not yet been submitted.  The PSI states Bayer suffered a loss based on Mr. Robinson's and his co-conspirator's domestic sales of the blood derivative products ("BDP") intended for export because Bayer could have sold these products domestically at a higher price.[3]  While noting the significant potential loss to Bayer, the PSI concluded the exact amount of loss is too difficult to calculate and assessed loss based on the alternative theory of gain.  *See* U.S.S.G. 2B1.1, App. Note 3(B) (gain appropriate "only if there is a loss but it reasonably cannot be determined").  Based upon a review of the discovery, however, it appears Bayer was aware that Mr. Robinson, through the company Excim Trading Company ("Excim"), was selling these products domestically and permitted those sales to continue, either expressly or implicitly by turning a blind eye to evidence of domestic sales. While not relevant to Mr. Robinson's guilt, this evidence is crucial to understand whether Bayer suffered any "loss" as that term is set out in U.S.S.G. 2B1.1.

The evidence of Bayer's knowledge and implicit assent is apparent through a variety of documents that Mr. Robinson submitted to probation, going back to 2000.  However, some of the documents that evidence Bayer's knowledge and assent have been redacted based on the attorney-client privilege.  The redacted documents involve incidents of diversion in 1998 and

---

[3] Mr. Robinson submitted documents to probation showing why Bayer could not, or would not, have sold some of these products in the United States at all.

2

2003 with Excim and other co-conspirators/defendants. These redactions appear in the context of business discussions, not legal advice, and in many instances the in-house lawyer is merely copied on the email rather than providing any substantive comment. The privilege log in support of the redactions repeatedly sets out the basis for the redaction simply as "communication conveying information for purpose of obtaining legal advice" without providing any additional information or context to determine whether the assertion of privilege is appropriate.

Accordingly, Mr. Robinson requests this Court issue a subpoena to Bayer, pursuant to Rule 17(c), requiring it to produce in unredacted form its communications concerning (1) the 1998 revelation of domestic sales by its domestic exporter and any decision to terminate that sales relationship; (2) the 2003 revelation of domestic sales by Excim and its decision to permit that sales relationship to continue; and (3) whether Bayer sustained any profit or loss from the domestic sales of the blood derivative products by Excim.

## FACTUAL BACKGROUND

### A. *Bayer Learns of Diversion in 1998 by American Medical Link/Khokhar*

In 1998, American Medical Link ("AML"), owned by Nisir Khokhar (a co-conspirator in the instant case) held itself out to Bayer as a domestic exporter and purchased product intended for export. One product purchased by AML for export was 5% IGIV non-SD, a blood derivative product that Bayer was selling to other markets but not in the United States, where it was selling 10% SD, a newer version of IGIV developed by Bayer.

In May 1998, Bayer learned AML was selling Bayer's 5% IGIV non-SD domestically. John Cutter, a Bayer employee and another co-conspirator in the instant case, was the sales representative responsible for the AML account. On May 4, 1998, he advised his supervisor, Chris Smith, and Christine Buchanan, Director of International Customer Relations, about the

3

possible diversion. (Ex. A, BAY[4] 87 ("IGIV 5% redirected to US"); 370 ("re-importation of IGIV")) He wrote to Smith and Buchanan to "put in context" the reports of AML diversion, specifically noting (1) the 5% IGIV non-SD had not been redirected from US distributors because it was not manufactured to be sold domestically; (2) AML received only 0.67% of Bayer's total IGIV supply; and (3) supply shortages had "placed additional pressure on our business to maximize profitability." (Ex. A, BAY 370). By way of separate email, Cutter also emailed Smith alone and explained "It is not surprising given the supply shortage and price conditions in the U.S. that some IGIV 5% is finding its way back into the US market from … US based distributors." (Ex. A, BAY 87) Cutter also suggested "ceas[ing] further shipments to AML to avoid any potential problems." *Id.*

Ten days later, on May 14, 1998, Cutter forwarded these emails to Leonard Dwarica, in-house counsel for Bayer, and emphasized from the earlier email the fact that the product was manufactured for export, and thus not redirected from domestic distributors. (Ex. A, BAY 87; 89) The content of those emails from Cutter to Dwarica have been redacted as "communication conveying information for purpose of obtaining legal advice." (Ex. B, Bayer Vol. Priv. Log, 4/10/09, at #4 & 6 re BAY 87 & 89)[5] Dwarica forwarded these emails to additional Bayer (non-legal) employees, and those comments have also been redacted as "communication conveying information for the purpose of obtaining legal advice." (Ex. A, BAY 91-94; Ex. B, Bayer Vol. Priv. Log, 4/10/09, at ## 8,9 re BAY 91-94)

---

[4] In response to government subpoenas, Bayer/Talecris used a variety of bates number prefixes – BAS, BAY, TAL, and TAS – and submitted four privilege logs that correspond to the four bates number prefixes. For this Motion, the documents have been divided by bates number prefix, each as a separate exhibit. The four privilege logs are also included as separate exhibits.

[5] Upon request, the government provided Bayer's privilege log to undersigned counsel, who makes no contention that the government is privy to the documents sought herein.

4

On May 20, 1998, Carol Moore, VP of Worldwide Regulatory Affairs and Mary Ann Lamb, Senior Director for Regulatory Affairs, became involved in the AML diversion matter.[6] (Ex. A, BAY 96)  Moore and Lamb were informed Bayer sold the diverted product to AML, who Bayer believed was exporting Bayer product.  *Id*.  Lamb responded that Bayer was licensed to sell the IGIV 5% non-SD in the United States and that the product was "safe" to sell in the United States.  (Ex. A, TAL 119)  Lamb also recommended "we need to better communicate with our distributors to make certain product is only going to those markets for which we intend it to be sold."  *Id.*  Later that day, Moore forwarded the first email to Dwarica, who responded. (Ex. A, BAY 96)  Moore's emails to and from Dwarica have been redacted as "communication providing information for the purpose of obtaining legal advice."  (Ex. B, Bayer Vol. Priv. Log, 4/10/09, at # 14 re BAY 96)  Moore then responded to Lamb's email, and those comments have also been redacted, although not included in any privilege log.  (Ex. A, TAL 119; *see also* Ex. C, TAL priv. log)

Meanwhile, on that same date in Bayer's International Sales division, Christine Buchanan notified Smith and Cutter that "this issue has not yet died" and that Moore had requested information about where the diverted lot had been sent.  (Ex. A, BAY 372)  A portion of Buchanan's email has been redacted but not included on any privilege log.  Smith responded:

> Chris [Buchanan], while I am concerned about ANY possible return to product to the US, the amount in english label IS relatively small, no.  We need to monitor this, but control how excited the Corp gets over such a small amount.
>
> We will stop all shipments to the guilty party, if we find one.
>
> Try and minimimise [sic] the damage for me.

---

[6] Pursuant to a grand jury subpoena, Lamb testified in 2005 that she had never been involved in matters of product distribution related to diversion. (Ex. F, Lamb GJ testimony dated 11/2/05 at 12)  That testimony was four years before Bayer provided to the government these redacted documents showing her involvement in prior issues of product distribution related to diversion.

*Id.* Later that date and into the next, Smith traded emails with Dwarica about AML's re-importation of IGIV. (Ex. A, BAY 368-69) These emails have been redacted as "communication providing information for the purpose of obtaining legal advice" and "communication providing legal advice." (Ex. B, Bayer Vol. Priv. Log, 4/10/09, at # 18 re BAY 368-69)

On May 26, 1998, Smith emailed Dwarica, copying Moore and Cutter about the re-importation. (Ex. A, BAY 368) That email has been redacted, as cited above. However, two minutes later, Smith emailed Cutter and Buchanan, stating:

> Until this is resolved, AML is on the 'out' list. If they get away with making their own discision [sic] on who to ship (domestic or export) we cannot use them. They need to convince us that the shipment was made.

(Ex. A, TAL 443) Apparently, through Smith's prior (redacted) emails with Bayer's counsel, a decision had been made about how to handle the allegations against AML that it was diverting product.

The next week, Khokhar, the owner of AML, made a pitch to Cutter to explain the alleged diversion and to encourage Bayer to maintain its relationship with AML. (Ex. A, TAL 442) Cutter forwarded the correspondence to Smith and Buchanan. (*Id.*) The AML document has two areas of redaction but is not included in any privilege log. (Ex. C) Soon thereafter, Bayer ceased its sales relationship with AML.

### B. Bayer Enters Into Business Partnership with New Domestic Exporters in 2000

By 2000, Bayer was introduced to two new domestic exporters, Bio2000 (owned by Khokhar) and Excim (owned by John Perez). The players at Bayer remained the same – Smith, Cutter, Buchanan, Moore, and Lamb. Bio2000 and Excim, through Mr. Robinson and Perez, represented to Bayer that they wanted to purchase blood derivative product for export. Almost

immediately, Bayer began to receive reports about diversion by these two companies of IGIV into the US market. (Ex. D, BAS 2192 "Urgent-product diversion", dated 12/13/00). These reports seem to have been ignored largely, and sales between Bayer and Bio2000/Excim flourished.[7] In fact, in February 2002, the Florida Deparmnet of Health provided copies of Excim packing slips to Lamb (and possibly Buchanan) showing Excim was selling Bayer's product domestically to wholesale distributors in Florida, California, and Illinois. (Ex. H) With that information in hand, Lamb, on behalf of Moore, responded to the Florida Department of Health that "There are no restrictions, contractual or otherwise for the wholesale distribution [of BDP sold to Excim] in the United States of America." (Ex. I)

### C. *2003 BioMed Audit Confirmed for Bayer Excim's Domestic Sales Activity*

In May 2003, Bayer conducted a Distributor Audit of one of its domestic wholesalers, BioMed. The Audit occurred just a few months after federal authorities executed a search warrant on BioMed. Through that Audit, Bayer identified significant inventories from three lots (26NOK51, 26NON21, and 26NOTJ1) of Bayer BDP not sold directly from Bayer. (Ex. D, BAS 4379-80). The Audit states BioMed management informed Bayer that these lots were purchased from one of Bayer's domestic exporters, but did not identify the company by name, and that the identification of the domestic exporter was "under further review." (*Id.*)

By May 20, 2003, Bayer had identified Excim as the source of the lots found at BioMed. (Ex. D, BAS 4371-72; 4376-78; 4381-82). This realization set off a string of emails amongst Bayer's upper management concerning "Excim Trading Company – Miami, Fl" (Ex. D, BAS 4295-4304) These emails were between Smith,[8] Cutter and others. Of the seven people who

---

[7] From 2000-2005, Bayer's sales to Excim and Bio2000 were in excess of $40 million.

[8] Smith testified at the grand jury in 2007 and stated he was not aware of any domestic exporter selling product in the United States. (Ex. G, Smith GJ testimony, dated 12/12/07, at 55) Again,

7

received these emails, the only lawyer is E. Wolf, who was merely copied on the email. These pages of emails are redacted almost completely as "communication re customer audit" and "communication forwarding information and seeking legal advice re customer audit." (Ex. E, Bayer Priv. Log re 5/9/07, 7/18/07 & 12/8/08 subpoenas, dated 4/10/09, at ##4-6 re BAS 4295-4304)[9]

Despite this knowledge that Excim was selling its export product to US wholesalers, Bayer continued to sell to Excim export product, well aware that Excim was selling on the domestic market. Rather than terminating Excim as a business partner, Bayer simply had Mr. Robinson sign a statement of intent that Excim was to export product, even though Mr. Robinson had signed a nearly identical document in 2000 that plainly had not been enforced by Bayer. As set out above, this instance was not the first time Bayer learned about and continued to permit Excim's domestic sales. This decision to continue to sell to Excim stands in stark contrast to Bayer's decision in the late 1990's to terminate sales to AML when a similar audit showed AML lot numbers in a US wholesaler's inventory. Of particular note, Bayer has never sought to enforce its contractual provisions against AML, Bio2000, or Excim.[10]

---

this testimony seems to be before the government received the documents from Bayer showing Smith's awareness of and involvement in Excim's domestic sales and Bayer's decision to allow the sales relationship to continue.

[9] This privilege log indicates that other significant correspondence about the revelation, from the BioMed audit, that Excim was selling domestically were not disclosed to the government at all. *See. e.g., Id.* at ##1-3, 7 (primarily correspondence between non-legal employees withheld as privileged).

[10] Bayer seems to be a reluctant "victim." This case originated as an outgrowth of the BioMed case, not from a criminal or civil complaint by Bayer. In what is essentially a breach of contract case, Bayer never initiated any civil action against the defendants based on their domestic sales. Bayer has refused to make any of its employees available to defense counsel for interview, and may have taken the same position with the government, as the only employee statements provided to the defense were compelled through grand jury subpoena, and not through FBI 302

D. ***This Material is Relevant to Presentence Investigation Report and Sentencing Issues***

The primary factor in sentencing in this case is the loss amount as calculated under U.S.S.G. 2B1.1. The PSI states that Bayer incurred a loss from the Excim sales and makes no mention of Bayer's knowledge about the sales. While the PSI states any loss amount would be difficult to calculate, it does not consider the fact that Bayer was aware of the domestic sales, permitted those sales to continue, and may have profited from these sales. The government's discovery disclosures revealed multiple instances in which Bayer was made aware of Excim's domestic sales. Unlike in 1998 with respect to AML, however, Bayer decided to continue its relationship with Excim, undeterred (and perhaps unsurprised) by the reports of domestic sales.

Why the wholesale change in position from 1998 to 2003 when Bayer's upper management and in-house counsel possessed evidence of diversion by its domestic exporters? The redacted information most likely provides the answer. For some (redacted) reason, in 1998 Bayer severed its relationship with AML immediately based on a single instance of diversion, ignoring AML's and Cutter's efforts to explain the diversion as an isolated incident and refusing to give AML a second chance. Five years later, in a diametrically opposed reaction, Bayer continued its sales relationship with Excim despite the evidence of domestic sales by Excim. The reason for the change in policy, however, is redacted. If Bayer made a business decision to continue its relationship with Excim, as the evidence suggests, then this Court should be aware of that fact in sentencing Mr. Robinson.

## ARGUMENT

This Court possesses the authority to authorize Mr. Robinson to serve a subpoena *duces tecum* on Bayer pursuant to Fed. R. Crim. P. 17, which provides "[a] subpoena may order the

---

reports, presumably because the government was unable to interview the employees absent a grand jury subpoena.

9

witness to produce any books, papers, documents, data, or other objects the subpoena designates. The court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence." *Id.* Rule 17(c) "reflects the command of the Sixth Amendment that the full power and processes of the courts are available to defendants in criminal cases to help them defend against the charges brought by the Government." *United States v. Beckford*, 964 F.Supp. 1010, 1016 (E.D.Va. 1997);[11] *see also* 25 *Moore's Federal Practice* § 617.02[l] at 617-7; 2 Wright, *Federal Practice and Procedure: Criminal* 4d § 271 at 238). As the Supreme Court has recognized, the purpose of Rule 17(c) was to "establish[ ] a more liberal policy for the production, inspection and use of materials at the trial." *Bowman Dairy Co. v. United States*, 341 U.S. 214, 220, 71 S.Ct. 675 (1951). The Rule further serves "to expedite the trial by providing a time and place before trial for the inspection of the subpoenaed materials." *Bowman Dairy Co.*, at 220, and "to prevent delays at trial which typically… occur[ ] when documents [a]re produced in response to a subpoena *duces tecum* requiring production at trial." *Beckford*, at 1021. A Rule 17(c) subpoena is not limited to trial and may also be issued for the purpose of sentencing. 2 Wright, *Federal Practice and Procedure, Criminal* 4d § 272 at 242-3 (2009)

     Rule 17(c) permits a broad range of material to be subject to a subpoena *duces tecum*. The Rule is designed "'for obtaining relevant evidentiary material [from a third party] that the moving party may use at trial.'" *United States v. Holihan*, 248 F.Supp.2d 179, 183 (W.D.N.Y. 2003). In other words, as the Supreme Court has recognized, the Rule allows a party to inspect

---

[11] Unless otherwise indicated, all internal citation and quotation is omitted and all emphasis added.

materials "for the purpose of course of enabling the party to see whether he can use it or whether he wants to use it." *Bowman Dairy Co.*, 341 U.S. at 220 n.5.

### A. Mr. Robinson's Request Satisfies the Standard for Issuing Rule 17(c) Subpoena

The test for granting a Rule 17(c) subpoena duces tecum, set forth in *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090 (1974), requires the moving party to show:

> (1) [T]hat the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."

*Id*. at 699-700. The Court further recognized that "[e]nforcement of a pretrial subpoena *duces tecum* must necessarily be committed to the sound discretion of the trial court since the necessity for the subpoena most often turns upon a determination of factual issues." *Id*. at 702.

In this case, Mr. Robinson's request satisfies the four prongs of the *Nixon* standard. First, the documents are evidentiary and relevant.[12] These documents, showing Bayer's knowledge of Excim's domestic sales and its decision to handle that matter differently from earlier similar instances, refute the notion that Bayer incurred a loss for which Mr. Robinson should receive a higher guideline calculation under U.S.S.G. 2B1.1. These documents go directly to the heart of matters relevant and material to Mr. Robinson's sentencing and his ability to refute statements in the PSI, because the loss amount drives the sentence in this matter.

Second, these redacted materials are not otherwise available to Mr. Robinson and cannot be obtained through any other source except by subpoena to Bayer. Bayer has refused to make its employees available for interview (seemingly for the government as well as for Mr.

---

[12] Mr. Robinson will address the issue of attorney/client privilege and why that does not bar the subpoena in a separate section, *infra*.

11

Robinson).  Mr. Robinson has no reason to think the government has had access to the redacted information or that it has it in its possession.[13]  These documents and the very material information they contain remain in the sole possession of Bayer.

Third, Mr. Robinson cannot prepare properly for sentencing without fully understanding Bayer's decision to continue its relationship with Excim, despite making a contrary decision in 1998 concerning AML.  Receiving this information at sentencing, rather than in advance, would prejudice Mr. Robinson and prohibit him from fully exploring and advising the Court of Bayer's position with respect to Excim and to domestic sales by exporters in general.

Fourth, this request is made in good faith and not as a fishing expedition.  Mr. Robinson's request is narrowly tailored to seek only those documents relevant to Bayer's awareness of Excim's domestic sales, its decision to permit these sales to continue, and the profit made by Bayer resulting from that relationship.

### B. *The Attorney-Client Privilege Does Not Shield Bayer's Redacted Materials*

Bayer has redacted the requested information on the basis of attorney-client privilege and submitted a privilege log.  The privilege log contains the same broad, generic justification for nearly all of its redactions relevant to this motion: "communication conveying information for the purpose of obtaining legal advice."  In this Circuit, "the privilege is not a favored evidentiary concept in the law since it serves to obscure the truth, and it should be construed as narrowly as is consistent with its purpose."  *United States v. Suarez*, 820 F.2d 1158, 1160 (11th Cir. 1987); *see also In re Grand Jury Investigation*, 599 F.2d 1224, 1235 (3rd Cir. 1979) ("[B]ecause the privilege obstructs the search for the truth and because its benefits are, at best, indirect and

---

[13] Any such disclosure by Bayer to the government would be a waiver of the attorney-client privilege and would entitle Mr. Robinson to the unredacted documents.

speculative, it must be strictly confined within the narrowest possible limits consistent with the logic of its principle.").

In general, a corporation enjoys an attorney-client privilege for communications between employees and in-house counsel that are intended to be confidential and were made for the purpose of obtaining or providing legal advice. *Upjohn Co. v. United States*, 449 U.S. 383, 395-96, 121 S. Ct. 677 (1981). A corporation's attorney-client privilege can become particularly troublesome in the context of in-house counsel because communications that relate to business rather than legal issues do not enjoy the protections of the privilege, yet business and legal communications are often intimately intertwined and difficult to distinguish. *Leonen v. Johns-Manville*, 135 F.R.D. 94, 98 (D.N.J. 1990). "When advice given by an attorney related to both business and legal matters, the legal advice must predominate in order for the attorney-client privilege to apply." *Carpenter v. Mohawk Indus., Inc.*, 2007 WL 5971741, at *9 (N.D. Ga. Oct. 1, 2007). As one court explained, "when the ultimate decision then requires the exercise of business judgment and when what were relevant nonlegal considerations incidental to the formulation of legal advice emerged as the business reasons for and against a course of action, those business reasons considered among executives are not privileged." *Eglin Federal Credit Union v. Cantor*, *Fitzgerald Securities Corp*. 91 F.R.D. 414, 420 (N.D. Ga. 1981). Here, the redacted correspondence occurred in the context of discussions about the business decision of whether to continue the relationship with AML and/or Excim. In exercising its business judgment, Bayer employees may have communicated with in-house counsel, but that does not cloak those communications with privilege.

Moreover, many of the emails are between non-legal Bayer employees, who simply copied an attorney on the email. However, copying an email to an attorney does not automatically make the communication privileged. As the Fifth Circuit has acknowledged:

> [E]mails in which in-house [] attorneys are merely sent copies of the text of the email, or in which they are merely one of many addresses, should not be privileged, unless the email is directed to the attorney or sent by the attorney. To rule otherwise would allow parties to evade the privilege limitations by sending copies of every company-generated email to the company's attorney so as to protect the communication from discovery, regardless of whether legal services were sought or who the other recipients of the email were.

*In re Avantel*, 343 F.3d 311, 321 n. 11 (5th Cir. 2003); *see also Motley v. Marathon Oil Co.*, 71 F.3d 1547, 1550-51 (10th Cir. 1995) ("[T]he mere fact that an attorney was involved in a communication does not automatically render the communication subject to the attorney-client privilege."). Bayer's repeated explanation for asserting the privilege provides no facts suggesting the communication related to specific legal advice. And the non-redacted portions of the emails suggest the nature of the communications to be business in nature, not legal. Given the fact that a person's period of incarceration may rest on the content of these redacted emails, at the very least an *in camera* review of these documents is appropriate to assess whether Bayer's standard basis for redaction, made time and time again with no additional facts, is legitimate.

Additionally, Bayer may have waived its privilege if it claims it had no knowledge of Excim's domestic sales. A party may waive the privilege "if it injects into the case an issue that in fairness requires an examination of otherwise protected communications." *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1417 (11th Cir. 1994); *see also United States v. Bilzerian*, 926 F.2d 1285, 1291 (2nd Cir. 1991) (defendant waived privilege by testifying about belief that actions legal); *Conkling v. Turner,* 883 F.2d 883 F.2d 431, 435 (5th Cir. 1989) (RICO plaintiff waived privilege by injecting into the litigation the issue of when he know or should have known

14

of fraud); *Baratta v. Homeland Housewares LLC*, 242 F.R.D. 641, 643 (S.D. Fl. 2007) (plaintiff waived privilege by denying he assented to settlement negotiated by counsel).

Bayer has indicated it intends to submit a victim impact statement.[14]  Its employees have testified under oath that they were not aware of Excim's domestic sales, despite being notified about those sales and engaging in significant correspondence about those sales.  If, in fact, Bayer takes the position that it incurred a loss because it was not aware of Excim's domestic sales, then its privileged communications refuting this position become material, particularly with respect to whether the offense conduct under U.S.S.G. 2B1.1 should be increased based on a loss amount.  By contrast, if Bayer admits it suffered no loss or that it knew of Excim's domestic sales, then the six-point base offence level should not be increased for purpose of sentencing.

This 25th day of February, 2010.

/s/ Julie M. Wade
Georgia Bar No. 729705
The Wade Law Firm
24 Drayton Street, Suite 500
Savannah, GA 31401
(912) 233-3313
jwade@thewadelawfirm.com

---

[14] Bayer's status as a "victim" is further undermined by probation's suggestion that no restitution is due to Bayer, despite the government having secured over $1.5 million in forfeiture from the defendants (and one person not prosecuted) in this matter.

**CERTIFICATE OF SERVICE**

The undersigned certifies that on this day I served all parties in this case in accordance with the notice of electronic filing that was generated as a result of electronic filing in this Court.

Respectfully filed this 25th day of February, 2010.

                                        /s/ Julie M. Wade
                                        Georgia Bar No. 729705
                                        The Wade Law Firm
                                        24 Drayton Street, Suite 500
                                        Savannah, GA 31401
                                        (912) 233-3313
                                        jwade@thewadelawfirm.com